United States Court of Appeals,

Eleventh Circuit.

No. 94-4561.

JCC, INC., Ellis K. Kahn, Paul Richard Bell, Petitioners,

v.

COMMODITY FUTURES TRADING COMMISSION, Respondent.

Sept. 15, 1995.

Petition for Review of an Order of the Commodity Futures Trading Commission.

Before COX, Circuit Judge, RONEY and WOOD[*], JR., Senior Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge:

JCC, Inc. ("JCC"), Ellis K. Kahn, and Paul Richard Bell petition this court to review the final opinion and order of the Commodity Futures Trading Commission ("Commission" or "CFTC"). The Commission upheld the sanctions imposed by the Administrative Law Judge ("ALJ") for violations of the antifraud, record keeping, and supervisory provisions of the Commodity Exchange Act ("Act"), and for violations of certain regulations of the Commission. In reaching this result, however, the Commission conducted a *de novo* review of the factual record as it felt that deference to the ALJ's factual findings would not be appropriate. The petitioners raise several challenges to the Commission's opinion, including its decision to review the factual record *de novo,* its finding that the evidence supports Kahn's conviction as a "controlling person" under the Act, and its decision to affirm the large monetary sanctions

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

imposed by the ALJ.

                              I. BACKGROUND

     The factual background and procedural history of this case
have already been well-documented in the opinions of the ALJ and
the Commission.    Accordingly, we need only summarize that
information here.   In March 1989, the Commodity Futures Trading
Commission initiated an administrative enforcement proceeding by
issuing a complaint, pursuant to information it received from its
Division of Enforcement ("Division"), which charged that the JCC,[1]
EDCO Management Corporation ("EDCO"),[2] Kahn,[3] Bell,[4] and Edward

---

[1]At all times relevant to this matter, JCC was a registered
futures commission merchant as required by 7 U.S.C. §§ 6d and 6f.
The term "futures commission merchant" is defined in the
Commission's regulations to mean:

          (1) Individuals, associations, partnerships,
     corporations, and trusts engaged in soliciting or in
     accepting orders for the purchase or sale of any
     commodity for future delivery on or subject to the
     rules of any contract market and that, in or in
     connection with such solicitation or acceptance of
     orders, accepts any money, securities, or property (or
     extends credit in lieu thereof) to margin, guarantee or
     secure any trades or contracts that result or may
     result therefrom;  and

          (2) Shall include any person required to register
     as a futures commission merchant under the Act by
     virtue of part 32 or part 33 of this chapter.

17 C.F.R. § 1.3(p).

[2]EDCO initially acted as a branch office of JCC.  EDCO was
later registered as an introducing broker which was guaranteed by
JCC.  The Commission's regulations define the term "introducing
broker" to mean:

          (1) Any person who, for compensation or profit,
     whether direct or indirect, is engaged in soliciting or
     in accepting orders (other than in a clerical capacity)
     for the purchase or sale of any commodity for future
     delivery on or subject to the rules of any contract
     market who does not accept any money, securities, or

property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; and

(2) Includes any person required to register as an introducing broker by virtue of part 33 of this chapter: *Provided,* That the term "introducing broker" shall not include:

(i) Any futures commission merchant, floor broker, or associated person, acting in its capacity as such, regardless of whether that futures commission merchant, floor broker, or associated person is registered or exempt from registration in such capacity;

(ii) Any commodity trading advisor, which, acting in its capacity as a commodity trading advisor, is not compensated on a per-trade basis or which solely manages discretionary accounts pursuant to a power of attorney, regardless of whether that commodity trading advisor is registered or exempt from registration in such capacity; and

(iii) Any commodity pool operator which, acting in its capacity as a commodity pool operator, solely operates commodity pools, regardless of whether that commodity pool operator is registered or exempt from registration in such capacity.

17 C.F.R. § 1.3(mm).

[3]Kahn was the president and a principal of JCC. Kahn was also registered as a floor broker and as an associated person ("AP") of JCC as required by 7 U.S.C. §§ 6e and 6k. The term "floor broker" is defined in the Commission's regulations to mean:

any person who, in or surrounding any pit, ring, post or other place provided by a contract market for the meeting of persons similarly engaged, shall purchase or sell for any other person any commodity for future delivery on or subject to the rules of any contract market and shall include any person required to register as a floor broker under the Act by virtue of part 33 of this chapter.

17 C.F.R. § 1.3(n). The Commission's regulations define, in pertinent part, the term "associated person" to mean:

any natural person who is associated in any of the following capacities with:

Lerner[5] had violated certain provisions of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.,*[6] and the Commission's regulations.

The conduct questioned in the Commission's complaint centers around the solicitation activities of the employees of JCC and EDCO in connection with a managed commodity futures trading program which was coined the "Futures Long Term Account" ("FLT").[7] The employees of JCC and EDCO enlisted participants in the FLT program through telephone solicitations. These solicitations were based on scripts written by Kahn, with assistance provided by Bell and

---

(1) A futures commission merchant as a partner, officer, or employee (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' or options customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged;

(2) An introducing broker as partner, officer, employee, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' or option customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged....

17 C.F.R. § 1.3(aa)(1)-(2).

[4]Bell was a vice-president and a principal of JCC. Bell was also registered as an AP of JCC.

[5]Lerner was the president and a principal of EDCO. Lerner was also registered as an AP of EDCO. Prior to his involvement with EDCO, Lerner had been an AP and branch manager of JCC.

[6]The Act was amended, subsequent to the ALJ's initial decision, by the Futures Trading Practices Act of 1992 ("FTPA"). The FTPA renumbered certain provisions of the Act. When referring to provisions of the Act, this opinion will utilize their post-FTPA designations.

[7]JCC operated the FLT program from July 1984 through the summer of 1988. EDCO operated it from February 1986 until late 1987.

others.

Under the FLT program, FLT units were generally offered to the public for $6000. Of this amount, $2500 was kept by JCC as a nonrefundable, nonamortized fee. This fee entitled program participants to the benefit of JCC's management services for one year regarding the remaining $3500 which JCC used to margin the purchase and sale of futures contracts. The customers chose which market they wished their money to be invested in and were led to expect frequent trading in their designated market. At the end of the one-year period, JCC ceased trading the customer's account unless the customer paid a renewal fee.

In Count I of the underlying complaint, the Commission charged that JCC, EDCO, Kahn, Bell, and Lerner had violated § 4b(A) of the Act, 7 U.S.C. § 6b(a),[8] by fraudulently soliciting customers to

---

[8]Section 4b(A) provides:

> It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

> (i) to cheat or defraud or attempt to cheat or defraud such other person;

> (ii) willfully to make or cause to be made to such

participate in the FLT program.  This count primarily addressed alleged misrepresentations concerning the likelihood of profit and the possibility of loss.  Among other allegations, the associated persons ("AP's") of JCC and EDCO were also charged with misstating their role in the trading of FLT accounts and with understating the import and applicability of the Risk Disclosure Statement that they were required to provide to prospective customers pursuant to § 1.55 of the Commission's regulations, 17 C.F.R. § 1.55.[9]  The complaint alleged that JCC and EDCO were liable both as primary

---

other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person....

[9]Section 1.55 provides:

(a)(1) Except as provided in § 1.65, no futures commission merchant, or in the case of an introduced account no introducing broker, may open a commodity futures account for a customer unless the futures commission merchant or introducing broker first:

(i) Furnishes the customer with a separate written disclosure statement containing only the language set forth in paragraph (b) of this section (except for nonsubstantive additions such as captions) or as otherwise approved under paragraph (c) of this section; *Provided, however,* that the disclosure statement may be attached to other documents as the cover page or the first page of such documents and as the only material on such page;  and

(ii) Receives from the customer an acknowledgement signed and dated by the customer that he received and understood the disclosure statement.

See subsection (b) for the required language of the risk disclosure statement.

violators and as principals for the acts of their agents under §
2(a)(1)(A) of the Act, 7 U.S.C. § 4,[10] and § 1.2 of the Commission's
regulations, 17 C.F.R. § 1.2.  As EDCO was acting as an agent and
guaranteed introducing broker for JCC at all relevant times, the
complaint also alleged that JCC was liable as a principal for the
acts of EDCO under § 2(a)(1)(A) of the Act and § 1.2 of the
Commission's regulations.  The complaint alleged that Kahn, Bell,
and Lerner were liable as aiders and abetters and as controlling
persons under §§ 13(a) and 13(b) of the Act, 7 U.S.C. §§ 13c(a) and
13c(b).[11]

---

[10]Section 2(a)(1)(A) states:

> For the purposes of this chapter the act,
> omission, or failure any official, agent, or other
> person acting for any individual, association,
> partnership, corporation, or trust within the scope of
> his employment or office shall be deemed the act,
> omission, or failure of such individual, association,
> partnership, corporation, or trust, as well as of such
> official, agent, or other person.

The language of § 1.2 of the Commission's regulations is
substantially identical.

[11]Sections 13(a) and 13(b) provide:

> (a) Any person who commits, or who willfully aids,
> abets, counsels, commands, induces, or procures the
> commission of, a violation of any of the provisions of
> this chapter, or any of the rules, regulations, or
> orders issued pursuant to this chapter, or who acts in
> combination or concert with any other person in any
> such violation, or who willfully causes an act to be
> done or omitted which if directly performed or omitted
> by him or another would be a violation of the
> provisions of this chapter or any of such rules,
> regulations, or orders may be held responsible for such
> violation as a principal.

> (b) Any person who, directly or indirectly,
> controls any person who has violated any provision of
> this chapter or any of the rules, regulations, or
> orders issued pursuant to this chapter may be held

Count II of the complaint charged that JCC and Kahn had

violated § 4g of the Act, 7 U.S.C. § 6g,[12] and §§ 1.31 and 1.35(a)

_____

liable for such violation in any action brought by the
Commission to the same extent as such controlled
person.  In such action, the Commission has the burden
of proving that the controlling person did not act in
good faith or knowingly induced, directly or
indirectly, the act or acts constituting the violation.

[12]Section 4g provides:

(a) In general

Every person registered hereunder as futures
commission merchant, introducing broker, floor broker,
or floor trader shall make such reports as are required
by the Commission regarding the transactions and
positions of such person, and the transactions and
positions of the customer thereof, in commodities for
future delivery on any board of trade in the United
States or elsewhere;  shall keep books and records
pertaining to such transactions and positions in such
form and manner and for such period as may be required
by the Commission;  and shall keep such books and
records open to inspection by any representative of the
Commission or the United States Department of Justice.

(b) Daily trading records:  clearinghouses and contract
    markets

Every clearinghouse and contract market shall
maintain daily trading records.  The daily trading
records shall include such information as the
Commission shall prescribe by rule.

(c) Daily trading records:  floor brokers, introducing
    brokers, and futures commission merchants

Floor brokers, introducing brokers, and futures
commission merchants shall maintain daily trading
records for each customer in such manner and form as to
be identifiable with the trades referred to in
subsection (b) of this section.

(d) Daily trading records:  form and reports

Daily trading records shall be maintained in a
form suitable to the Commission for such period as may
be required by the Commission.  Reports shall be made
from the records maintained at such times and at such

of the Commission's regulations, 17 C.F.R. §§ 1.31[13] and 1.35(a)[14],

places and in such form as the Commission may prescribe by rule, order, or regulation in order to protect the public interest and the interest of persons trading in commodity futures.

[13]Section 1.31 provides:

(a)(1) All books and records required to be kept by the Act or by these regulations shall be kept for a period of five years from the date thereof and shall be readily accessible during the first 2 years of the 5-year period.  All such books and records shall be open to inspection by any representative of the Commission or the United States Department of Justice.

(2) A copy of any book or record required to be kept by the Act or by these regulations shall be provided, at the expense of the person required to keep the book or record, to a Commission representative upon the representative's request.  Instead of furnishing a copy, such person may provide the original book or record for reproduction, which the representative may temporarily remove from such person's premises for this purpose.  All copies or originals shall be provided promptly....

(b) Reproductions on microfilm, microfiche and optical disk may be substituted for hard copy as follows:

(1) Computer, accounting machine or business machine generated records may be immediately produced or reproduced on microfilm or microfiche and kept in that form.  Computer generated records may be immediately produced on optical disk in conformity with the requirements of paragraph (d) of this section and kept in that form.

(2) Except as provided herein, for all other books and records, microfilm or microfiche reproductions thereof may be substituted for the hard copies for the final three years of the 5 year period.  Trading cards and written customer orders, required to be kept pursuant to § 1.35(a-1)(1), (a-1)(2) and (d), must be retained in hard-copy form for the full five-year period.

(c) If microfilm, microfiche or optical disk substitution for hard copy is made, the persons required to keep such records shall:

(1) At all times have on their premises and make available upon request to representatives of the Commission or the Department of Justice:

(i) Facilities for easily readable projection of the microfilm or microfiche, or display of information stored on optical disk, that allow immediate examination of their records;

(ii) If the records are preserved on microfilm or microfiche, facilities for immediately producing complete, accurate and easily readable facsimile enlargements of the records;  and

(iii) If the records are preserved on optical disk, facilities for immediately producing complete, accurate and easily readable hard copies of the records and the means to provide, immediately upon request, any Commission or Department of Justice representative with copies of the records on Commission compatible machine-readable media, as defined in § 15.00(*l* )(1) and (2).

[14]Section 1.35(a) provides:

(a) *Futures commission merchants, introducing brokers, and members of contract markets.*  Each futures commission merchant, introducing broker, and member of a contract market shall keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures, commodity options, and cash commodities.  Each futures commission merchant, introducing broker, and member of a contract market shall retain the required records, data, and memoranda in accordance with the requirements of § 1.31, and produce them for inspection and furnish true and correct information and reports as to the contents or the meaning thereof, when and as requested by an authorized representative of the Commission or the United States Department of Justice.  Included among such records shall be all orders (filled, unfilled, or canceled), trading cards, signature cards, street books, journals, ledgers, canceled checks, copies of confirmations, copies of statements of purchase and sale, and all other records, data and memoranda, which have been prepared in the course of its business of dealing in commodity futures, commodity options, and cash commodities.  Among such records each member of a contract market must retain and produce for inspection are all documents on which trade information is originally recorded, whether or not such documents must

by allegedly failing to keep complete and systematic records of the FLT program.  Kahn was further charged under this count as an aider and abetter and as a controlling person under §§ 13(a) and 13(b) of the Act.

Count III of the complaint charged that JCC, EDCO, Kahn, Bell, and Lerner had violated § 166.3 of the Commission's regulations, 17 C.F.R. § 166.3,[15] by allegedly failing to diligently supervise their employees.

During the sixteen days of hearings before the ALJ, dissatisfied customers and former AP's testified for the Division, and satisfied customers and current AP's testified for the respondents.  Although the ALJ conceded that the Division had not established a "slam dunk" case, he nonetheless found against JCC, EDCO, Kahn, Bell, and Lerner on every count brought against them. *In re JCC, Inc.,* [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,184 (Initial Decision Dec. 13, 1991) ("Initial Decision" or "I.D.").  As sanctions, the ALJ ordered the respondents to cease and desist from violating the antifraud provisions of the Act.  The

---

be prepared pursuant to the rules or regulations of either the Commission or the contract market.

[15]Section 166.3 provides

Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.

ALJ also revoked the futures commission merchant or associated person registrations of JCC, Kahn, Bell, and Lerner.[16] In order to prevent the respondents from "walk[ing] away with ill-gained finances," the ALJ also imposed the following civil monetary penalties: JCC $50,000, Kahn $510,000, Bell $100,000, and Lerner $50,000.[17] As EDCO was no longer operating, the ALJ did not impose a monetary penalty against it.

Kahn and Lerner then challenged the appropriateness of their monetary penalties in relation to their net worth. After further hearing and briefing, the ALJ subsequently vacated Lerner's monetary penalty, but he affirmed Kahn's penalty. *In re JCC, Inc.*, [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,320 (Initial Decision on Monetary Sanctions June 29, 1992).

JCC, Kahn, and Bell subsequently filed a timely appeal to the Commission for a review of the ALJ's initial decision. [18] In reviewing this matter, the Commission conducted a *de novo* review of the factual record[19] as it agreed with the petitioners' argument that the ALJ's opinion was somewhat ambiguous. Although the ALJ began his discussion with a recitation of the correct

---

[16]The ALJ did not, however, revoke Kahn's floor broker registration as he found that the wrongful acts committed by Kahn did not extend to his activities as a floor broker.

[17]In regard to JCC and Kahn's fines, however, $10,000 was imposed in light of record-keeping violations found under count II.

[18]Neither EDCO nor Lerner appealed from the ALJ's initial decision.

[19]The Commission did not remand the matter for clarification because the presiding ALJ was no longer available to the Commission.

"preponderance of the evidence" burden facing the Division, he went on to state that the "difficult, concealed, or cleverly twisted" nature of the evidence in this case would allow the burden of proof to be met upon a "lesser showing" by the Division. I.D. at 38,467 and 38,468. The ambiguity created by this statement [20] was compounded by the ALJ's decision to compare the credibility of the parties' witnesses en masse, thereby hampering an effective review, for example, of the "several" Division witnesses whom the ALJ found "weak or inconclusive." I.D. at 38,467.

Upon its independent review of the record, the Commission largely upheld the ALJ's liability findings as well as the ALJ's imposition of sanctions. *In re JCC,* [1992-1994 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 26,080 (CFTC May 12, 1994) ("Commission's Decision" or "C.D"). The Commission found that the testimony of all of the Division's customer witnesses was credible as it was largely uncontroverted. Despite the possibility that ulterior motives might have fueled their testimony, the Commission also found several former AP's[21] that had testified for the Division to be credible as their testimony was consistent with that of the other AP's and with the testimony of the Division's customer witnesses.

---

[20]The petitioners interpreted this statement as establishing a burden of proof which is less than the weight of evidence, whereas the Division interpreted it as requiring a less strict showing—but still no less than the weight of the evidence—than might be expected in a more simple case. While the Commission was more inclined to agree with the Division's interpretation, it decided to resolve the ambiguity in the petitioners' favor.

[21]In particular, the Commission found credible the testimony of Kevin Moran, Stanley Strother, Paul Snyder, and William Cordo.

Although the Commission's—albeit more particularized—credibility conclusions did agree with those reached by the ALJ, the Commission nonetheless vacated the ALJ's findings of aiding and abetting liability under § 13(a) of the Act and failure to supervise liability under § 166.3 of the Commission's regulations. The Commission felt that these charges unnecessarily duplicated the ALJ's finding of "knowing inducement" liability pursuant to § 13(b) of the Act. In addition, the Commission disagreed with the ALJ's decision to not revoke Kahn's floor broker registration; the Commission found that representations regarding Kahn's floor broker registration were an element of the fraudulent activity at JCC and EDCO and, further, that "Kahn's illegal activities render[ed] him unfit for registration in any capacity." C.D. at 41,581 n. 38.

The petitioners then filed a timely petition before this court pursuant to 7 U.S.C. § 9 seeking review of the Commission's final decision and order.

## II. STANDARD OF REVIEW

In our review of this matter, we shall deem the Commission's factual findings to be "conclusive" if we determine that those findings are supported by "the weight of evidence." 7 U.S.C. § 9. This standard requires that the factual findings be supported by the preponderance, or greater weight, of the evidence. *E.g., Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977) (citations omitted). Our task in this regard is to " "determin[e] whether the finder of fact was justified, *i.e.,* acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the

reasonable inferences drawn therefrom and other pertinent circumstances, supported [the] findings.' " *Clayton Brokerage Co. of St. Louis v. CFTC,* 794 F.2d 573, 579 (11th Cir.1986) (per curiam) (quoting *Myron v. Hauser,* 673 F.2d 994, 1005 n. 17 (8th Cir.1982) (citations omitted)).

The scope of our review of the Commission's legal interpretations depends on the nature of the legal question involved. If the legal issue implicates the Commission's expertise, we will defer to the Commission's interpretation of the law so long as it is reasonable. *Monieson v. CFTC,* 996 F.2d 852, 858 (7th Cir.1993) (citations omitted). If, on the other hand, the legal issue is of the type that courts commonly address—such as constitutional matters—a *de novo* review is appropriate. *Id.*

If a sanction imposed by the Commission falls within statutory limits, we will overturn it only if we find that it represents an abuse of discretion. *Haltmier,* 554 F.2d at 563 (citations omitted). As we have previously stated in this regard,

> [t]he function of a court in reviewing administrative imposition of sanctions is not to determine the wisdom of imposing them or the hardship they impose, but rather to see if they bear a reasonable relation to the practices which invoked them and if they evidence such relation, to approve them.

*Kent v. Hardin,* 425 F.2d 1346, 1349-50 (5th Cir.1970) (citations omitted).

### III. DISCUSSION

*A. The Commission's De Novo Review of the Factual Record*

The petitioners first argue that the Commission erred by conducting a *de novo* review of the factual record, instead of remanding for a new hearing. In particular, the petitioners object

to the Commission's independent assessment of the credibility of the witnesses that testified before the ALJ.

1.

We must first resolve the Commission's argument that the petitioners have waived their right to challenge the *de novo* review of the record as they failed to properly raise this argument below. It is true that, while the petitioners did contest the ALJ's group credibility analysis, they did not challenge the Commission's authority to independently resolve credibility issues nor did they specifically request a new hearing. However, we find that this issue is properly before us as the petitioners did not need to—indeed could not—raise a challenge to the Commission's authority to independently review the factual record until the Commission had performed the challenged act. *See, e.g., Clayton Brokerage v. CFTC,* 794 F.2d at 583 ("[I]t would be unreasonable to require Clayton to have learned of the decision and raised the issue it creates before the CFTC prior to the CFTC's denial of review in this case....").

2.

Turning now to the merits, it is our view that the Commission did not actually determine credibility from the ground-up in this case.[22] The Commission did not simply decide to credit the crucial testimony of the Division's customer witnesses after reading the cold transcription of the record—as the petitioners would have us believe—instead, the Commission credited this testimony only after

_____

[22]We explicitly reject the petitioners' contention that the ambiguities present in the ALJ's initial decision rendered it "the functional equivalent of no decision at all."

noting that the petitioners had not substantially objected to it.[23]

Thus, the Commission's decision to credit the testimony of the Division's witnesses may ultimately be viewed as resulting more from a waiver on the part of the petitioners than as a true *de novo* review by the Commission. This was, in short, a situation where " "it fairly could be said that a credibility evaluation from hearing and seeing the witnesses testify was unnecessary' " on the part of the Commission. *New England Coalition on Nuclear Pollution v. United States Nuclear Regulatory Comm'n,* 582 F.2d 87, 100 (1st Cir.1978) (quoting *Gamble-Skogmo, Inc. v. FTC,* 211 F.2d 106, 115 (8th Cir.1954)).

Moreover, the other testimony credited by the Commission—that of the former AP's who testified for the Division—was given weight,

---

[23]The petitioners argue that the testimony of the Division's customer witnesses contradicts their claims of fraud, and is thus unreliable, as certain customers admitted on cross-examination that they understood the risks inherent in commodity trading. This factor, however, goes to causation and while relevant in a reparations case, it is not an element of an enforcement proceeding brought by the Division. The Division need only establish that the JCC and EDCO AP's made misleading statements—whether these statements were actually relied upon is immaterial.

> Congress intended in Section 4b(A) and (C) of the Act to forbid attempts to deceive or to defraud. Requiring proof of reliance would be at odds with the plain language of the statute, for attempted frauds by definition do not involve a completed act, and therefore reliance cannot be an element of attempted fraud.

*In re GNP Commodities, Inc.,* [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,360 at 39,218 (CFTC Aug. 11, 1992), *aff'd in part and modified sub nom., Monieson v. CFTC,* 996 F.2d 852 (7th Cir.1993). Moreover, as discussed below, the fact that the customers were provided with the Risk Disclosure Statement required by 17 C.F.R. § 1.55 is not necessarily enough to absolve the petitioners of liability either.

in large part, because it concurred with that of the Division's customer witnesses. Then, once the Commission had credited the Division's testimony, it naturally discredited the testimony which contradicted it—that offered by the petitioners. The main impact of the Commission's decision to review the record *de novo* was that the Commission did not feel as bound to the ALJ's factual findings as it would have otherwise; this was of little practical significance, however, as the Commission did not deviate from the general conclusions reached by the ALJ.

3.

Furthermore, the Commission is empowered by the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* ("APA"), to conduct an independent review of the factual record before it. "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b). The Commission's regulations are in accord with the APA: "On review, the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial decision by the Administrative Law Judge and make any findings or conclusions which in its judgment are proper based on the record in the proceeding." 17 C.F.R. § 10.104(b).

We have previously held that agencies have the authority to make independent credibility determinations without the admitted advantage presented by the opportunity to view witnesses firsthand. In reviewing the decision of the Social Security Administration's Appeals Council, for example, we stated: "[T]he Appeals Council is

not bound by the ALJ's credibility findings, but when it rejects such findings, it should ordinarily do so expressly, articulating the reasons for its conclusion." *Parker v. Bowen,* 788 F.2d 1512, 1520 (11th Cir.1986) (en banc). The reason behind *Parker* 's express and articulated rejection requirement, as well as the documentation requirements of 5 U.S.C. § 557(c),[24] is to support a meaningful review. In this case, we find that the Commission has satisfied the *Parker* standards: The Commission expressly rejected the ALJ's fact findings and it sufficiently articulated its reason for doing so.[25] Moreover, the "special problem," *Parker,* 788 F.2d at 1520, presented when an agency overturns an ALJ's credibility determinations[26] is largely absent here as the Commission

_____

[24]Section 557(c) requires the Commission to provide "a statement of ... findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record."

[25]The Commission stated:

> We agree with respondents that the general focus of the ALJ's credibility determination—essentially comparing the overall credibility of the Division's witnesses with the overall credibility of the respondents' witnesses—undermines our ability to assess the reliability of his determination. For example, without knowledge of which Division witnesses the ALJ regarded as offering "weak or inconclusive" testimony, we cannot review his determination for clear error. In this case, we are unable to identify which witnesses the ALJ relied upon in making his findings. For these reasons, we have independently assessed credibility in making our findings of fact.

C.D. at 41,573 n. 14.

[26]As the *Parker* court stated:

> "The notion that special deference is owed to a credibility finding by a trier of fact is deeply imbedded in our law. The opportunity to observe the demeanor of a witness, evaluating what is said in the

substantially concurred in the ALJ's credibility conclusions.[27]

The petitioners cite *Gamble-Skogmo, Inc. v. FTC,* 211 F.2d 106 (8th Cir.1954) in support of their position, but in our view it is simply inapposite. Whereas in *Gamble-Skogmo* the ALJ (before whom all testimony was given) retired before issuing an initial decision,[28] the ALJ here did issue an opinion, albeit a somewhat

---

light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."

788 F.2d at 1521 (quoting *Beavers v. Secretary of Health, Educ. & Welfare,* 577 F.2d 383, 387 (6th Cir.1978)).

[27]In a similar vein, those cases holding that the courts of appeals are to apply a heightened standard of review where the ALJ and the Commission disagree regarding credibility determinations are inapplicable here as the Commission did not disagree with the ALJ's conclusions *per se,* rather the Commission simply felt that the documentation of those determinations was too ambiguous to be effectively reviewed upon appeal. *See, e.g., Morris v. CFTC,* 980 F.2d 1289, 1293 (9th Cir.1992) ("Agency findings which run counter to those of the ALJ "are given less weight than they would otherwise receive.' ") (quoting *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.) (citations omitted), *cert. denied,* 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983)); *Purdy v. CFTC,* 968 F.2d 510, 519 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1326, 122 L.Ed.2d 711 (1993) ("[W]here the Commission's findings d[o] not agree with the ALJ's.... the appellate court should make a more searching review.").

[28]Interpreting § 5(c) of the APA, now reported at 5 U.S.C. § 554(d), the *Gamble-Skogmo* court stated that

we think it must be recognized that the primary concern of the provision was to prescribe a procedural guaranty, in the class of administrative proceedings which it covered, that *recommended or initial decisions,* which were to be submitted *by a trial examiner to an administrative tribunal* for its consideration or guidance, would in general be made by the examiner who had conducted the hearing and received the evidence, and not by some other examiner.

211 F.2d at 113 (emphasis added).

ambiguous one.  Furthermore, the question before us does not address the sufficiency of the ALJ's factual findings,[29] but whether it was proper for the Commission to reach its own factual findings, independent of the ALJ's findings.  *Van Teslaar v. Bender,* 365 F.Supp. 1007 (D.Md.1973), also cited by the petitioners, is likewise inapplicable as it, too, addresses only the midstream replacement of the initial hearing examiner.[30]

The prior decisions of the Commission cited by the petitioners are also distinguishable.[31]  In both cases, the Commission was unable to resolve a credibility dispute without the aid of demeanor evidence.  As discussed above, the Commission was able to satisfactorily determine the credibility of the witnesses in this case—aided in no small part by the petitioners' failure to

---

[29]As the Second Circuit has remarked in this regard:  "[W]e are to review the Commission's findings, not those of the Administrative Law Judge...."  *Haltmier,* 554 F.2d at 561.  *See also Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742, 747 (D.C.Cir.1988).  This does not mean, however, that we are to ignore the ALJ's findings—the ALJ's findings constitute a portion of the record as a whole and, as such, may be reviewed in order to determine whether the CFTC's decision is supported by the weight of the evidence.  *See Morris v. CFTC,* 980 F.2d 1289, 1293 (9th Cir.1992) (citations omitted).

[30]We are reminded of the modest hypothesis offered by President Abraham Lincoln in explanation of his nomination to seek a second term:  "[I]t is not best to swap horses while crossing the river."  This is also the general status of the law regarding the ALJ-level fact finding process:  "The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency."  5 U.S.C. § 554(d).  As discussed above, the APA does allow one to "swap" fact finders in between river crossings.  5 U.S.C. § 557(b).

[31]*Nacht v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* [1992-1994 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 26,057 (CFTC Apr. 19, 1994);  *Gilbert v. Refco, Inc.,* [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,081 (CFTC June 27, 1991).

substantially object to the credibility of any particular Division witness.

*B. Sufficiency of the Evidence Supporting the Finding that Mr. Kahn Violated § 13(b) of the Commodity Exchange Act*

Kahn[32] argues that the weight of the evidence is insufficient to establish his liability under § 13(b) of the Act, 7 U.S.C. § 13c(b). "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *In re Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,251 at 38,794 (CFTC Mar. 11, 1992) (citation omitted). Under § 13(b) of the Act, the Division has the burden here of establishing that "the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Kahn contends that the evidence adduced before the Commission was insufficient to establish that he knowingly induced the sales solicitation violations committed by the JCC and EDCO AP's.[33] To support a finding that a controlling person knowingly induced conduct which violates the Act, "the Division must show that the

---

[32]Neither Bell nor JCC challenge the sufficiency of the evidence underlying any of the Commission's findings against them.

[33]Kahn does not contest the Commission's finding that he was a "controlling person" within the meaning of the Act. Furthermore, Kahn does not contest the finding that the JCC and EDCO AP's whom he controlled repeatedly violated the Act through their solicitation activities. Therefore, the only question before us is whether the weight of the evidence establishes that Kahn acted with the scienter required by § 13(b) of the Act.

controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel,* [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988) (footnote omitted).

In brief, the evidence marshalled against Kahn is as follows: The Commission first found that Kahn was actively involved in the training and monitoring of JCC's sales personnel. Kahn personally hired many of the AP's, established their pay and benefits, and covertly monitored their sales solicitation efforts. In addition, Kahn required the JCC and EDCO AP's to utilize sales scripts; Kahn taught the AP's to read the scripts verbatim. Kahn wrote some of these scripts, and he reviewed and approved all of them. [34] Kahn

---

[34]After describing some of the more galling misrepresentations concerning the likelihood of profits and risk of loss made by the JCC and EDCO AP's, the Commission then described one role that Kahn's scripts played in deceiving potential investors:

> JCC and EDCO amplified the effect of these blatant misrepresentations by employing more subtle techniques to deceive customers about the likelihood of profits. The scripts Kahn prepared, for example, often emphasized historical market moves that earned customers substantial profits, and encouraged customers to anticipate similar profits. Given the distorted view of the likelihood of profit and loss fostered by the blatant misrepresentations discussed above, such history-based statements do not escape our scrutiny merely because such a profit was possible, indeed, had actually been earned at a particular historical point.... Without additional historical context, such as the frequency of the described market movement and whether market fundamentals or related circumstances have changed since the last occurrence, and some cautionary language about the difficulty of catching a market trend and escaping its reversal, customers can be misled by undue emphasis on such historical successes. In the circumstances of this case, we find that JCC and EDCO's focus on such successes helped

also visited EDCO each month to conduct training sessions.

The record also contains direct evidence that Kahn was aware of illegal activity. Several employees of JCC and EDCO testified that they spoke in late 1986 with Kahn about what they perceived to be the employment of illegal marketing strategies by JCC and EDCO. Kahn did eventually terminate the individual implicated by the allegations—Ted Jacobs[35]—but it took Kahn eight months to do so. The Commission agreed with the ALJ's characterization of Kahn's remedial conduct as "too little too late." C.D. at 41,579.

The Commission also noted the evidence of record that indicated that Kahn had actively encouraged AP's to violate the Act:

> Former APs testified that Kahn and others taught them, when soliciting customers, to minimize risk, to illustrate profit potential with phenomenal or aberrant historical market moves, to characterize the $2500 management fee as insignificant compared to potential profits, and to use the Regulation 1.55 risk disclosure statement as a sales tool by explaining away various paragraphs of the document as inapplicable to the FLT program. They were not taught to explain the allocation schedule,[36] nor to explain that even in a discretionary account

---

> deceive their customers about the fundamental nature of the futures markets.
>
> C.D. at 41,576 (citations to the record and footnotes omitted).

[35]Jacobs was an AP of JCC and he also performed a managerial role at EDCO.

[36]As the Commission explained, block orders to buy or sell

> were allocated to particular FLT program customers according to a computerized allocation sequence. Generally, a given customer's right to an execution depended on the time that had passed since he received his last allocation. Those who had not been allocated a position for the longest time were the first to be allocated new positions. FLT program customers who had received an allocation more recently were given a lower

such as the FLT account, futures trading remains highly speculative.

C.D. at 41,579 (citations to the record and footnote omitted).

In light of Kahn's extensive involvement in the solicitation process, and the breadth of the wrongdoing by the JCC and EDCO AP's, the Commission inferred (1) that Kahn was possessed of constructive knowledge of these illegal activities and (2) that Kahn failed to take effective corrective action. To support a finding of constructive knowledge, the Division must show that Kahn "lack[ed] actual knowledge only because he consciously avoid[ed] it." *In re Spiegel,* [1987-1990 Transfer Binder] ¶ 24,103 at 34,767 n. 11 (citing *United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); *United States v. Jewell,* 532 F.2d 697, 702 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976)). After reviewing this matter, we find that the weight of the evidence supports the Commission's conclusion.

Kahn attempts to refute the Commission's finding of constructive knowledge by focusing separately on each individual element of the Commission's analysis. Kahn argues, for example, that the mere fact that he occasionally monitored sales

priority. Under an exception to the general policy, new FLT program customers typically were allocated a position before existing FLT customers who had specified the same market.

C.D. at 41,571 (footnote omitted). Thus, even if a customer had chosen a lucrative market, there was no guarantee that that customer's account would be traded in time to capitalize on the favorable market conditions. Not only were customers left in the dark regarding the allocation system, at least two AP's testified that the system was not even explained to the AP's.

solicitations is insufficient to establish that he consciously avoided obtaining actual knowledge about the illegal activities at JCC and EDCO. This seriatim approach is ultimately unavailing, however, as it is the body of evidence as a whole which must be considered here.

Kahn also argues that, even if he is found to have had constructive knowledge of the fraudulent activity at JCC and EDCO, he cannot be found to have knowingly induced this conduct as he had instituted various compliance measures to prevent fraudulent activity of this type. We note, however, that the fact that prospective FLT customers were provided with the Risk Disclosure Statement required by 17 C.F.R. § 1.55 is insufficient to relieve Kahn of liability here as the Risk Disclosure Statement was coupled with material omissions and affirmative misrepresentations about risk. *See Clayton Brokerage,* 794 F.2d at 580-81. [37] Likewise,

---

[37]As we stated in *Clayton Brokerage:*

> [P]resentation of the risk disclosure statement does not relieve a broker of any obligation under the [Act] to disclose all material information about risk to customers....
>
> Furthermore, this case involves affirmative misrepresentations as to risk.... Oral representations may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customer's particular situation.... [The risk disclosure statement] does not warn the customer to disbelieve representations that certain trading strategies can limit losses, that the broker's scheme can overcome inherent market risks, or that certain commodities are less volatile. Those unfamiliar with the workings of markets are unlikely to understand that no broker can eliminate or diminish risk. The customer may be led to believe that the course of trading on which he or she embarks is not susceptible to the extreme risk that the statement warns "can" or "may" accompany trading. Further, the

Kahn's tape-recorded compliance system [38] is also insufficient to relieve him of liability:  One "cannot use the customer agreement as a contractual shield against valid federal regulation and liability for violation of such regulation, or as an "advance exoneration of contemplated fraudulent conduct.' "  *Myron v. Hauser,* 673 F.2d 994, 1007 (8th Cir.1982) (quoting *CFTC v. U.S. Metals Depository Co.,*  468  F.Supp.  1149,  1161  (S.D.N.Y.1979)) (other citations omitted).[39]

statement uses terms of art that require explanation, without which the significance of the warning to the particular customer may not be understood.  Thus, it is not logically inconsistent to believe the warning on the risk disclosure statement while at the same time believing representations such as were made by [the AP].

794 F.2d at 580-81 (citations omitted).

[38]Under Kahn's compliance system, customers who had recently opened an FLT account were asked, in general, whether they had read the Risk Disclosure Statement, whether the broker had made any representations beyond those contained in the documents, and whether they fully understood the fees and risks involved.

Neither the ALJ nor the Commission were overly impressed with the compliance system.  The Commission summarized the ALJ's fact findings on this issue as follows:

After JCC or EDCO had received the customer's money, another person (not the soliciting AP) called the customer and asked "a litany inquiry of leading questions."  Both questions and answers were recorded on tape.  A number of customers testified that their APs told them that the compliance call was merely a government requirement and did not apply to the FLT program.  The APs instructed customers how to answer the questions;  if a "wrong" answer was given, the compliance call was stopped.  The person conducting the compliance call would then transfer the customer back to the AP for further coaching.

C.D. at 41,572 n. 11 (citations to the record omitted).

[39]Furthermore, a finding of good faith is not necessarily enough to exculpate a controlling person under the Act as § 13(b)

We conclude that the weight of the evidence sufficiently establishes that Kahn was aware—at least constructively—of the fraudulent sales solicitation activities, and that he had the power to prevent these activities, but failed to do so. Accordingly, we uphold the Commission's conclusion that Kahn is liable under § 13(b) of the Act.

*C. Whether the Sanctions Imposed by the Commission Constitute an Abuse of Discretion*

Two challenges are raised to the Commission's imposition of civil monetary penalties.[40] First, the petitioners argue that the fines are inappropriate as the decision to impose the fines was grounded in the ALJ's credibility-based findings which the Commission erroneously reviewed *de novo*. As discussed above, the Commission did not truly—for the most part—determine credibility *de novo* in this case and, in any event, the Commission is empowered to conduct a *de novo* review of the factual record. Thus, this argument is unavailing.

Second, the petitioners argue that even if the decision to impose the fines was properly reached, the decision nonetheless represents an abuse of discretion as the fines are excessive in relation to the gravity of their offenses and in relation to the

---

requires the Commission to prove a lack of good faith *or* knowing inducement. *See In re Spiegel,* [1987-1990 Transfer Binder] ¶ 24,103 at 34,767 ("[I]f the controlling person knowingly induces acts that amount to a violation, he will not escape liability merely because he acted in good faith.") (citation omitted).

[40]The petitioners do not contest the cease and desist order, nor do they contest the revocation of their registrations under the Act.

net worth of each petitioner.[41]  In determining the amount of a penalty under the Act, § 6(d) directs the Commission to, *inter alia,* consider "the appropriateness of such penalty to the net worth of the person charged, and the gravity of the violation." 7 U.S.C. § 9a.[42]  As the Commission has stated, "[a] fair consideration of the factors in Section 6(d) should ordinarily result in a civil penalty that does not exceed a respondent's net worth yet deters future violations by making it beneficial

---

[41]The ALJ justified the severe sanctions as follows:

> The demonstrated conduct goes to one of the more prominent reasons for antifraud protection.  The subtle deceptive nature of the activity makes it particular[ly] egregious....
>
> ... [T]he violations under this count are most egregious because the conduct reaches out to a public sector which is beset with the perplexing problem of securing a capital return in today's world of super mixed capital possibilities.  The nature of the solicitations was such that many persons without a firm understanding of the nature of the involved speculation were likely to become immersed in a venture with a high potential for financial disaster contrary to their understanding.
>
> The potential victims in such operations are so numerous and widespread that simple penalties will not suffice.  The individual respondents are all persons of large influence in the management and direction of the firms.  They are more than mere salesmen carrying out firm dictates.  They were, in fact, the dictators.

I.D. at 38,470.

[42]Effective October 28, 1992, the FTPA amended § 6(d) (redesignating it as § 6(e)) and obviated the Commission's duty to consider a respondent's net worth when assessing a monetary penalty.  7 U.S.C. § 9a(1).  The Commission has held, however, that this amendment does not apply retroactively to cases, such as this one, that were pending on its docket prior to October 28, 1992.  *See In re Gordon,* [1992-1994 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,667 at 40,182 n. 5 (CFTC Mar. 16, 1993) (citation omitted).

financially to comply with the requirements of the Act and Commission regulations rather than risk violations." *In re Premex, Inc.,* [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,165 at 34,892 to 34,893 (CFTC Feb. 17, 1988).

1.

Turning first to the gravity of the petitioners' conduct, we take note of the Commission's previous statements in this regard:

> Our gravity determination turns on the synthesis of two distinct components. The starting point is an assessment of the abstract or general seriousness of each violation at issue. The nature of some violations make them generally more serious than other violations. The general seriousness of a violation derives primarily from its relationship to the various regulatory purposes of the Commodity Exchange Act. Conduct that violates core provisions of the Act's regulatory system—such as manipulating prices or *defrauding customers should be considered very serious* even if there are mitigating facts and circumstances.... Once a violation has been generally located on the statutory continuum of seriousness, the focus shifts to the particular mitigating or aggravating circumstances presented by the unique facts of the individual conduct at issue....
>
> Several factors deserve special consideration in analyzing the individual culpability of a respondent.... A respondent who makes a mistake in the face of an ambiguous statutory duty or in circumstances that are unique and unforeseeable is less culpable than a respondent who knowingly and repeatedly violates the same provisions in an effort to gain a competitive edge.
>
> ... [T]he consequences flowing from the violative conduct should also be assessed. *If the respondent benefitted from the violation or if direct harm to customers or the market resulted, respondent's violation is more serious than those that result only in potential benefit or harm.* Moreover, a respondent's post-violation conduct—cooperation with authorities, attempts to cure the violation and provide restitution—may mitigate the seriousness of the violation.

*In re Premex,* [1987-1990 Transfer Binder] ¶ 24,165 at 34,890 to 34,891 (footnotes and citations omitted) (emphasis added). The bulk of each petitioner's monetary penalty—$500,000 of Kahn's $510,000 total, $40,000 of JCC's $50,000 total, and all of Bell's

$100,000 fine—was imposed in response to the numerous misrepresentations made to potential customers of the FLT program concerning the likelihood of profits and risk of loss. As the *Premex* court stated, "defrauding customers should be considered very serious." *Id.* at 34,890.

Moreover, the record reveals no mitigating factors in the petitioners' favor. The weight of the evidence demonstrates that the violations of the Act at issue here were "knowingly and repeatedly" committed; we are not dealing with a situation involving an isolated "mistake" arising from an ambiguous statutory duty or from circumstances that are unique and unforeseeable. *Id.* at 34,891. Furthermore, the consequences flowing from these repeated violations are very serious: It appears that the petitioners turned a handsome profit[43] and that many customers of the FLT Program were directly harmed as a result of these violations. Last, we note that the petitioners' post-violation conduct warrants no reduction of their fines. In light of the foregoing, we cannot find that the Commission abused its discretion by imposing a $510,000 fine against Kahn, a $50,000 fine against JCC, and a $100,000 fine against Bell.

2.

---

[43]The record reveals that JCC generated over $11.2 million in commission charges, and that EDCO generated over $7.4 million in commission charges, during the relevant period. Kahn's earnings from JCC exceeded $244,000 in 1985, $1.4 million in 1986, $1.2 million in 1987, and $272,000 in 1988. Bell's earnings from JCC exceeded $121,000 in 1985, $198,000 in 1986, $108,000 in 1987, and $122,000 in 1988. The record is unclear, however, in regard to exactly what percentage of each figure may be attributed to the FLT program. We note, however, that the petitioners have failed to introduce any evidence purporting to establish any income source other than the FLT program.

We next review the appropriateness of Kahn's $510,000 penalty in relation to his net worth.[44]  In reviewing the record pertaining to the quantification of Kahn's net worth, we note that Kahn claims assets totalling $718,500, whereas the Division claims that Kahn is actually worth $1,390,789.  The disparity is traceable to Kahn's reduction of many of his assets by 50% for a claimed spousal benefit.  Kahn claims that his $510,000 fine—which represents approximately 71% of his version of his net worth—is an "extraordinary" and "draconian" amount.  While the percentage of Kahn's net worth which this fine represents—assuming *arguendo* that Kahn's calculation of his net worth is correct—is on the high side of Commission precedent, this fine does not exceed the Commission's statutory authority,[45] nor is such a proportionately weighty fine unprecedented.  *See, e.g., Premex,* [1987-1990 Transfer Binder] ¶ 24,165 at 34,892 to 34,893 (imposing a monetary penalty which represented approximately 88% of the respondent's net worth).

Kahn cites *In re Incomco, Inc.,* [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,198 (CFTC Dec. 30, 1991), in support of his position on this issue.  Noting that it had "rarely imposed civil monetary penalties upon individuals as high as $550,000," the

---

[44]When the ALJ initially imposed the monetary penalties in his initial decision, he afforded the respondents the opportunity to demonstrate that the tentative penalties were unreasonable in light of their respective net worths.  JCC and Bell opted out of this proceeding and they have therefore waived the right to contest the propriety of their fines in relation to their net worths.

[45]Section 6(b) of the Act authorizes a fine of up to $100,000, or triple the monetary gain attained, for each violation of the Act.  Kahn does not argue that his fine is statutorily excessive.

Commission reduced the respondent's fine in that case from $550,000 to $105,000. *Id.* at 38,536 to 38,537 (citations omitted). The Commission's decision to reduce the penalty in that case, however, was influenced by the fact that the respondent had already been fined criminally, served jail time, and had been required to pay $1 million to the bankruptcy trustee. None of these considerations are applicable here.

While 71% does represent a substantial proportion of Kahn's assets, we cannot find that the Commission abused its discretion, especially since the bulk of Kahn's net worth appears to have been derived from the wrongful conduct here at issue.

## IV. CONCLUSION

For the foregoing reasons, the Commission's opinion and order is affirmed.

AFFIRMED.