COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

WILSHIRE INVESTMENT MANAGE-MENT CORPORATION, National Commodities Corporation, Inc., Andrew Alan Wilshire, Eric Scott Malcolmson and James Joseph Russo, Defendants.

No. 04–80862–CIV.

United States District Court, S.D. Florida.

Dec. 5, 2005.

**1306**

Allison Lurton, Rachel Entman, Jason Gizzarelli, Commodity Futures Trading Office, Division of Enforcement, Washington, DC, for Plaintiff.

Robert Lawrence Bonner, Homer & Bonner, Francisco Oscar Sanchez, Homer Bonner & Delgado, Miami, FL, for Defendants.

### *TRIAL ORDER*

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon a Complaint, [DE # 1], filed on September 14, 2004. In the Complaint, Plaintiff, the Commodity Futures Trading Commission ("CFTC"), alleges that Defendants violated the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §§ 1 *et*

*seq.,* and applicable CFTC Regulations. Specifically, the CFTC alleges that Defendants violated 17 C.F.R. § 33.10(a) & (c) (2003) which makes it unlawful

> for any person directly or indirectly: (a) To cheat or defraud or attempt to cheat or defraud any other person; ... (c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

*Id.*

By allegedly violating the CFTC's regulations on commodity transactions, the CFTC maintains that Defendants also violated 7 U.S.C. § 6c(b) (2002) which provides that

> no person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this Act ... contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

*Id.*

A four-day bench trial in this matter was held from August 8–11, 2005. During that time, the Court heard argument by the parties and testimony from multiple witnesses. The Court has reviewed the record, including the trial transcript, all evidence admitted at trial, the parties' post-trial filings, and is otherwise fully apprised in the premises.

### I. FINDINGS OF FACT

The evidence at trial consisted mostly of testimony by nine clients of Wilshire Investment Management Corporation (WIM), two auditors from the National Futures Association (NFA), and Defen-

dants Eric Scott Malcolmson ("Malcolmson"), James Joseph Russo ("Russo"), and Andrew Wilshire ("Wilshire"). The most telling aspect of the trial was the defendants' testimony. While it is understandably difficult to confront testimony by several investors about events transpiring years before, the defendants' testimony was simply not credible. They emphatically claimed that all the testimony of the investors was false. Although several of the investors had no previous experience in trading commodities or options, the brokers claimed that these novices always insisted on making their own decisions about trades and that many of the losses occurred when the investors disregarded their advice.

The Defendants would rarely answer a question directly. Rather than answer the question asked, a defendant would provide a torrent of jargon about "trading strategies," "systematic approaches," "computer generated signals," and "technical analysis."

The defendants claimed to be unable to remember when they had last read their deposition testimony, when they had made changes in their written direct testimony, or even what they had said moments before. Yet the defendants insisted that not only was the investors' testimony untrue, but that the defendants' accurately remembered all of the detailed conversations with their clients. While the defendants adamantly denied promising their clients high profits, suggesting that their other clients had been very successful, downplaying the risks of commodity trading, or using seasonal information to suggest profit potential, the investors' testimony consistently indicated otherwise. Indeed, the pattern established by the investors' testimony, despite the defendants' protestations, is undeniable.

The Court must first determine what specific statements were made to each investor by Defendants Russo, Malcolmson, and Wilshire. Based on the trial testimony, the Court finds the following:

### a. Tony Del Duco

Mr. Del Duco was initially contacted by Jon Vasta, a WIM account executive, who wanted him to open an account with WIM. Vasta told Mr. Del Duco that if he invested with Vasta, he would "make money." Vasta specifically referenced the approaching cold winter and said, because of this, heating oil was going to go "through the roof" and Mr. Del Duco could take advantage of the "seasonal swing." Later, after losing money on the initial heating oil trades, Vasta told Mr. Del Duco that he should purchase additional options in soybeans. Vasta promised that Mr. Del Duco would "at the very least" break even on the soybean trade, and would most likely recoup all his losses and make some money. Mr. Del Duco also had several conversations with Andrew Wilshire. During at least one conversation, Wilshire assured Mr. Del Duco that WIM's other clients were making money and Mr. Del Duco would too if he "stuck it out." Wilshire also promised that if Mr. Del Duco stayed with WIM, the company would make Mr. Del Duco's money back for him.

### b. Daniel McNamee

Mr. McNamee received a phone call from James Russo, an Associated Person ("AP") of WIM, after responding to an Internet "pop-up" ad for educational materials on commodity trading. Russo indicated that he specialized in options trading and that these options entailed "little or no risk unless the trader was a complete moron." Russo also indicated that options trading had an infinite "upside" and that profits were almost "guaranteed." Fur-

thermore, Russo claimed that "all his clients" who closely follow his recommendations realize significant profits in short periods of time. Over the course of several months, Russo constantly called Mr. McNamee, pressuring him to invest and suggesting that options trading would fund both Mr. McNamee's retirement and his children's education "within a few months." After Mr. McNamee opened an account at WIM, he spoke with Andrew Wilshire, who assured him that Russo was one of his best traders. Russo recommended investing in Japanese Yen, assuring Mr. McNamee that it was a "sure thing" and a "home run." When this investment failed, in May 2002, Russo encouraged McNamee to purchase crude oil options because Iraq was going to embargo oil sales to the U.S.

### c. Dennis Albrecht

Mr. Albrecht received a call from Eric Malcolmson, another WIM AP, after contacting WIM on the Internet. Malcomson said that he had just helped another client double or triple his investment. Mr. Albrecht had no experience in trading commodities or options. In January 2002, based on Mr. Malcolmson's advice, Mr. Albrecht invested first $5,000 and later an additional $15,000 in Japanese Yen. By March 2002, Mr. Albrecht had lost all but $23.94.

### d. Doreen Daidone

Ms. Daidone received a phone call from Malcolmson in 2000. Malcolmson repeatedly told her "I know I can make you money" and represented that he had been very successful making other clients rich through commodities trading. Malcolmson suggested investing in natural gas because as the winter wore on and grew colder people would use more gas for heat. He also told Ms. Daidone not to worry about risk and continually emphasized profit po-

tential. After Ms. Daidone's initial investment disappeared, and she indicated a desire to close her account, Malcolmson state "I will make your money back."

### e. Charles Bolam

Mr. Bolam also dealt with Eric Malcolmson. Malcolmson suggested that his experience and guidance would greatly reduce the risk of options trading. He encouraged Mr. Bolam to invest immediately because "time [was] critical" to take advantage of a record low in Japanese Yen. Malcolmson said that Mr. Bolam could make a large return immediately and insisted that he would miss a great opportunity if he did not invest immediately. Malcolmson did not address his clients' losses and only spoke about potential gains.

### f. Bruce McLean

Malcolmson contacted Mr. McLean in April 2001. Malcolmson claimed that WIM's "great research team" had produced a winning trade percentage of 75%–80%, and that Malcolmson's own clients were making a lot of money. In fact, Malcolmson told Mr. McLean he could expect to double his investment in a short period. After opening his account, Mr. McLean claims that Malcolmson purchased several options without authorization, resulting in a loss of most of the account.

### g. Duane Dipert

Mr. Dipert dealt with Russo and Michael Pucci, another account executive at WIM. Mr. Dipert invested $7,000 in September 2001 based on Russo's representation that he could make $30,000 and "retire early." After losing that $7,000, Mr. Dipert continued to invest with Pucci. In June 2002, Pucci made six unauthorized trades in Mr. Dipert's account which eventually wiped out Mr. Dipert's account.

### h. George Tracy

Mr. Tracy had an account with Malcolmson. Malcolmson encouraged Mr. Tracy to add more money to his account, stating that WIM clients had made a lot of money. Malcolmson recommended purchasing heating oil options immediately, before winter arrived in the northeast, because prices would go up in the winter.

### i. John Stevens

Mr. Stevens received a call from Malcolmson in September 2000. Malcolmson described himself as "very successful" and described WIM as one of the most successful trading firms. Malcolmson claimed to have a "proven method" for making profitable trades, and that he could double or triple Mr. Stevens' investment in a short time. Malcolmson also claimed to have turned $5,000 and $10,000 accounts into $100,000 accounts. While acknowledging that commodities trading involved some risk, Malcolmson described his method as "fool-proof."

Despite the frequent statements to these nine customers indicating that WIM clients made lots of money and that WIM brokers had methods and experience that limited the risk of trading commodities, the vast majority of WIM clients lost money. In fact, from September 2000 through September 2004, approximately 87% of WIM clients closed their accounts with a loss. *See Pl. Ex. 16.* During this period, Malcolmson and Russo's clients did even worse, losing money 88% and 89% of the time, respectively. *Id.* The largest gain any of Malcolmson's accounts closed with between 2000 and 2003 was $8,231.57; the largest gain by any of Russo's accounts was $4,192.73. *Pl. Ex. 16*, pp. 6, 9. Neither Malcolmson nor Russo nor any other WIM representative ever disclosed the firm's track record or the individual AP's track record to their clients.

In December 2003, Vilia Sutkus-Kiela and Matthew Pendell of the NFA met with Andrew Wilshire in connection with an NFA audit of WIM. Ms. Sutkus-Kiela and Mr. Pendell also conducted an exit interview with Wilshire on March 15, 2004 before issuing their audit on March 24, 2004. They presented the audit's conclusions to Mr. Wilshire, including concerns that WIM's sales solicitations were misleading and likely to deceive the public.

## II. ANALYSIS OF LIABILITY

### A. MALCOLMSON AND RUSSO

█ In a similar enforcement case brought by the CFTC, the Eleventh Circuit noted that the CFTC must prove three elements to establish liability for fraud; (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality.[1] *See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir.2002), *citing Hammond v. Smith Barney Harris Upham & Co.*, [1997–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617 (CFTC Mar.1, 1990); *CFTC v. Trinity Finan. Group, Inc.*, Comm. Fut. L. Rep. 27,179, 1997 WL 820970 (S.D.Fla. Sept. 29, 1997), *aff'd in relevant part by CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999).

### 1. Making of a Misrepresentation, Misleading Statement, or Deceptive Omission

In *R.J. Fitzgerald*, the Eleventh Circuit noted that "whether a misrepresentation has been made depends on the 'overall

---

1. The Eleventh Circuit also explicitly noted that "unlike a cause of action for fraud under the communion law of Torts, 'reliance' on the representations is not a requisite element in an enforcement action." *R.J. Fitzgerald*, 310 F.3d at 1328, n. 6.

message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald,* 310 F.3d at 1328. That Court found liability for statements overemphasizing profit potential and downplaying risk. These statements included telling customers that "huge profits" of "200 to 300%" and that customers needed act immediately because the market might "never" present such an opportunity again. *Id.* at 1329. The Court also noted that both the Court and the CFTC had previously condemned "linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs." *Id.* at 1330.

■ Russo and Malcolmson made several misrepresentations and misleading statements that exaggerated profit potential and downplayed risk, similar to those condemned in *R.J. Fitzgerald.* Russo told Daniel McNamee that his suggested investments had "infinite upside," that profits were "almost guaranteed," and that investing in Yen was a "sure thing." He even went so far as to say that options trading entailed "little or no risk unless the trader was a complete moron." Russo told Duane Dipert that he could make $30,000 off of a $7,000 investment and "retire early."

Malcolmson told Dennis Albrecht and John Stevens that he had helped clients "double or triple" their money and had turned $5,000 and $10,000 accounts into $100,000, even though 88% of his clients had lost money between 2000–2004 and the largest gain any of his clients had experienced was approximately $8,000. He guaranteed Doreen Daidone and John Stevens that he would make them money. He also suggested, to Charles Bolam, Bruce McLean, and John Stevens that his experience, research methods, and trading techniques would limit their risk, even going so far as to call his method "fool-proof." Fi-

nally, in direct contravention of previous Court and CFTC rulings, Malcolmson suggested to clients that they could make substantial profits by relying on seasonal trends and historical prices. For example, he told Doreen Daidone and George Tracy that natural gas and heating oil options (respectively) would increase as winter wore on. Just as the commercial in *R.J. Fitzgerald* told customers that they needed to act immediately to take advantage of a unique opportunity for gains in the corn market, Malcolmson told Charles Bolam that "time [was] critical" to take advantage of record lows in Japanese Yen.

The Defendants argue that their exuberant descriptions of profit potential were balanced by the risk disclosure documents that each customer signed and by the fact that each customer makes the ultimate decision of whether or not to place a trade. However, the Eleventh Circuit has consistently held that general risk disclosure statements cannot balance out clearly misleading statements. *See CFTC v. Sidoti,* 178 F.3d 1132, 1136 (11th Cir.1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *Clayton Brokerage Co. of St. Louis v. CFTC,* 794 F.2d 573, 580–81 (11th Cir. 1986) ("presentation of the risk disclosure statement does not relieve a broker of any obligation under the [Act] to disclose all material information about risk to customers."); *JCC, Inc. v. CFTC,* 63 F.3d 1557, 1569–70 (11th Cir.1995). Nor can the defendants hide behind the investment "decisions" of mostly novice investors led to believe that their broker's recommendations are fool-proof. Such a finding would fly in the face of the Act and its implementing regulations.

In addition to making misrepresentations and misleading statements, Russo and Malcolmson admittedly never dis-

closed that 88% and 89% of their customers, respectively, and 87% of WIM's customer overall, lose money. *R.J. Fitzgerald* found that omitting such dismal results (95% in that case), particularly in conjunction with exaggerated statements of profit potential, made the solicitations fraudulent as a matter of law. 310 F.3d at 1332–33. The Court stated that it is "misleading and deceptive to speak of 'limited risk' and '200–300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money." *Id.* at 1333 (citations omitted). Defendants here argue that more than 50% of all commodities trades, by necessity, end in a loss. However, the *R.J. Fitzgerald* Court specifically indicated that it is not how well a particular firm has fared in comparison to other that matters; rather the proper focus is on what a reasonable investor would want to know before investing. *Id.* Therefore, Malcolmson and Russo's failure to disclose their firm's poor trading record constitutes a deceptive omission.

## 2. Scienter

For federal securities fraud, scienter includes both intent to deceive and "severe recklessness." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 (11th Cir.1999). This requirement can be met "when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations...that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.'" *R.J. Fitzgerald,* 310 F.3d at 1328 (quoting *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001)). In *R.J. Fitzgerald,* the Court found the defendants, who were federally registered professionals knowledgeable of the commodities markets, were reckless in linking

profit expectations to seasonal trends, suggesting that the market could be timed to generate large profits, and inflating profit expectations while downplaying risks.

Again, Malcolmson and Russo's actions are closely analogous to the unacceptable behavior in *R.J. Fitzgerald.* As described above, they similarly made the type of statements listed in *R.J. Fitzgerald* and consistently condemned by the Eleventh Circuit and the CFTC. Some of the statements chronicled earlier are so outrageous that Malcolmson and Russo must have known they were misleading their customers, or, at the very least, that there was a high probability of harm. Malcolmson and Russo are federally registered professionals and profess to be knowledgeable in commodities trading and familiar with their industry's solicitation requirements. In light of this experience and knowledge, virtually guaranteeing profits, making recommendations based on seasonal trends, and misrepresenting their past success records constitutes an extreme departure from the standards of ordinary care.

## 3. Materiality

■ A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *R.J. Fitzgerald,* 310 F.3d at 1328–29 (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *R & W Technical Servs., Ltd. v. CFTC,* 205 F.3d 165, 169 (5th Cir.2000)).

One cannot seriously dispute that the misrepresentations and omissions Malcolmson and Russo made are material. Exaggerated statements of profit potential and suggestions that current conditions offer unique opportunities to profit would undoubtedly heavily influence a reasonable

investor's decision to invest. *R.J. Fitzgerald*, 310 F.3d at 1330; *In re JCC, Inc.*, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080 (CFTC May 12, 1994), *aff'd, JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir.1995). Therefore, Malcolmson and Russo have clearly violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10.

## B. Willshire Investment Management Corporation

■ WIM is vicariously liable for the violations of its employees. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B)

> [t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official agent, or other person.

Malcolmson and Russo made their fraudulent solicitations within the scope of their employment with WIM. As described in the findings of fact, at least one other WIM AP, Jon Vasta, made similar fraudulent misrepresentations to clients in the scope of his employment. The Defendants do not dispute that WIM is liable for these individuals' acts, other than to dispute the finding of an underlying violation. As the Court has found that WIM's employees have violated the Act, WIM is similarly liable.

## C. Andrew Wilshire

■ The CFTC seeks to hold Andrew Wilshire personally liable as "controlling person." Under Section 13(b) of the CEA, 7 U.S.C. § 13c(b),

> Any person who directly or indirectly, controls any person who has violated any provision of this chapter or any

rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as the controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting violation.

The CFTC also asserts that Wilshire violated 17 C.F.R. § 166.3 by failing to "diligently supervise" his APs. The parties do not dispute that Andrew Wilshire qualifies as a controlling person. He is President and CEO of WIM, hires new APs and brokers, supervises training, monitors solicitations, and is responsible for ensuring compliance with the CFTC's rules and regulations. However, the parties do dispute whether Wilshire acted in good faith or knowingly induced violations of the CEA and whether he diligently supervised his subordinates.

■ To show knowing inducement of conduct violating the CEA, the CFTC must "show that the controlling person had actual or constructive knowledge of the core activities that constitute the violation and allowed them to continue." *JCC*, 63 F.3d at 1568, *In re Spiegel*, [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,103 at 34, 767 (CFTC Jan. 12, 1988). To demonstrate constructive knowledge, the CFTC must show that Wilshire "lack[ed] actual knowledge only because he consciously avoid[ed] it." *JCC*, 63 F.3d at 1569; *In re Spiegel*, [1987–1990 Transfer Binder] ¶ 24,103 at 34, 767.

In *JCC*, the Eleventh Circuit upheld a finding of knowing inducement where the defendant was actively involved in training and monitoring sales personal, personally hired many of the APs, monitored sales solicitation efforts, and prepared sales scripts. There was also evidence that sev-

eral employees had reported illegal marketing behavior to the defendant and that the defendant's only response was to fire one offender eight months later.

Although not identical, the facts in this case are very similar to *JCC.* Wilshire was admittedly responsible for hiring, training, and monitoring WIM's APs. His post-trial brief even argues that he takes an "active role" in ensuring his APs' compliance with NFA and CFTC rules. He had notice, at least, of Jon Vasta's and Eric Malcolmson's violations through speaking with Tony Del Duco and John Stevens. Yet, he punished neither Mr. Vasta nor Mr. Malcolmson. Furthermore, Wilshire himself indicated that he does not accurately inform his customers of his firm's loss rate, implying that other WIM APs' failure to disclose such information was condoned, if not expressly encouraged. Finally, the extent and obviousness of the soliciting violations found by the Court simply belie any argument that Wilshire did not know what was occurring. Given Wilshire's own assertions about how extensively be monitors his brokers, he must have either known what their tactics were or, at the very least, been willfully blind. These facts indicate that Wilshire is liable not only as a "controlling person," but also for failure to diligently supervise.

### D. NATIONAL COMMODITIES CORPORATION, INC. (NCCI)

█ The CFTC seeks to hold National Commodities Corporation, Inc. (NCCI) liable for WIM's violation of the CEA based on a Guarantee Agreement between NCCI and WIM. In September 2000, NCCI and Wilshire entered into a Guarantee Agreement. In pertinent part, the Guarantee Agreement states.

> [NCCI] guarantees performance by [WIM] of, and shall be jointly and severally liable for, all obligations of the introducing broker under the Commodities Exchange Act, as it may be amended from time to time, and the rules, regulations and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all commodity customer, option customer, foreign futures customer and foreign options customer accounts of [WIM] entered into on or after the effective date of this agreement.

Pl. ex. 13. While the Defendants do not dispute the existence of this agreement or the language contained therein, they argue that NCCI did not agree to accept responsibility for intentional or willful misconduct. However, the Defendants do not point to any additional language in the agreement, any external evidence, or any principle of law to support its contention that the agreement does not cover willful or intentional misconduct.

The agreement clearly indicates that NCCI is "jointly and severally liable for *all obligations* of [WIM] under the Commodities Exchange Act..." (emphasis added). Nothing in the agreement suggests any distinction between willful violations of WIM's obligations versus merely negligent violations. The Defendants give no reason why the plain meaning is incorrect other than their conclusory statement that the agreement did not apply to willful acts. Therefore, NCCI is jointly and severally liable for WIM's violations.

### III. REMEDIES

#### A. INJUNCTION

█ The CFTC asks this Court to enter an injunction against the Defendants, prohibiting future violations of the CEA and barring them from engaging in any commodity-related activity, including soliciting customers and funds. In determining whether an injunction is appropriate, the Court should consider past illegal conduct

and the likelihood of future violations. *See, e.g. Sidoti,* 178 F.3d at 1137.

■ An injunction is appropriate in this case. As detailed above, the Defendants violated the CEA in dealing with at least nine customers. The violations included acts by multiple brokers at multiple times. More importantly, with respect to the potential for future violations, the Defendants have not acknowledged any wrongdoing, insisting rather that their sales tactics were completely legitimate. In fact, the lack of candor which they demonstrated at trial belies any intent of making good faith efforts to comply with restrictions in the future.

Defendants Malcolmson, Russo, Wilshire, and WIM are specifically enjoined from violating section 4c(b) of the CEA (7 U.S.C. § 6c(b)) and 17 C.F.R. § 33.10(a)-(c). However, because the violations were blatant, brazen, and repeated, a more extensive injunction is justified. *See CFTC v. Noble Wealth Data Information Svcs., Inc.,* 90 F.Supp.2d 676 (D.Md.2000). Therefore, Defendants Malcolmson, Russo, Wilshire, and WIM are further enjoined from engaging in any commodity-related activity, including soliciting new customers.

### B. RESTITUTION

■ The CFTC seeks restitution to compensate the customers defrauded by the Defendants. The Court has authority to order restitution under the "ancillary relief" provision in 7 U.S.C. § 13a-1. *CFTC v. Co Petro Marketing Group, Inc.,* 680 F.2d 573, 583–584 (9th Cir.1982); *CFTC v. Midland Rare Coin Exchange, Inc.* 71 F.Supp.2d 1257, 1264 (S.D.Fla. 1999).

■ The CFTC seeks restitution for all customer losses from 2000 through September 2004, a total of over $6 million.

The Defendants object that the CFTC has only presented evidence of fraudulent conduct with regards to nine customers and that the Court cannot presume, based on these few customers, that all WIM customers lost their money due to fraudulent solicitations. The CFTC argues that reliance can be presumed, either because all WIM solicitations omitted disclosure of WIM's track record or because Malcolmson and Russo's solicitations are so similar and consistent that they amount to "systematic and pervasive fraud."

The Court cannot infer, based on the evidence presented, that every WIM customer was harmed by a fraudulent solicitation. First, this case is not "primarily" an omissions case in which the Court can presume reliance. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Waters v. Int'l Precious Metals Corp.,* 172 F.R.D. 479, 485 (S.D.Fla.1996). While the Defendants' failure to disclose WIM's investment track record is certainly a significant part of the Court's fraud finding, the affirmative misrepresentations the Defendants made regarding profit potential, risk, and seasonal trends make this at least a mixed case of misrepresentation and omission. *See In re Amerifirst Securities Litigation,* 139 F.R.D. 423, 430 n. 4 (S.D.Fla.1991); *Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594 (S.D.Fla.1991).

Second, the evidence presented at trial was not sufficient to find that the wrongdoing was so systematic and pervasive in WIM that every customer was harmed by fraudulent solicitation. The CFTC tries to analogize to other non-class action cases where the Court has presumed pervasive fraud based on the testimony of a handful of customers. However, in these cases, the fraudulent acts were, by their nature, more certainly a part of every transaction. In *CFTC v. Noble Wealth,* the evidence

indicated that Noble Wealth conducted all of their trades outside the interbank market where it was supposed to place orders. 90 F.Supp.2d 676 (D.Md.2000). In *FTC v. Figgie Int'l Inc.*, the finding of fraudulent misrepresentation and omission was based on standardized sales presentations and company produced promotional materials. 994 F.2d 595 (9th Cir.1993). Here, the testimony presented primarily concerned two brokers. While the customers' testimony here did exhibit certain commonalities among Russo and Malcolmson's fraudulent tactics, there is little indication like in *Noble Wealth* or *Figgie* that similar tactics were necessarily a part of each WIM solicitation.[2]

Rather, this case is much closer to *CFTC v. Matrix Trading Group, Inc.*, 2002 WL 31936799 (S.D.Fla., Oct.3, 2002). In *Matrix*, the CFTC presented testimony from several defrauded customers who indicated common misrepresentations in sales solicitations. Indeed, the *Matrix* misrepresentations were virtually identical to those presented in this case. In *Matrix*, the CFTC only requested, and the Court only granted, restitution for the sixteen customers who testified at trial. *Id.* at *13–14. A similar remedy is appropriate here.

Restitution should be awarded to each of the following individuals[3] in the following amounts, representing their total losses.[4]:

1) Tony Del Duco: $88,103.17
2) George Tracy: $14,546.35
3) John Stevens: $4,988.11
4) Doreen Daidone: $4,559.89
5) Bruce McLean: $2,929.57
6) Charles Bolam: $4,905.00
7) Dennis Albrecht: $19,976.06
8) Daniel McNamee: $7,883.84

### C. CIVIL PENALTIES

■■■ The CFTC also asks the Court to impose civil penalties on the Defendants. The Court has authority to impose "on any person found in the action to have committed any violation a civil penalty in the

---

**2.** In addition to the nine testifying customers, the CFTC entered into evidence an audit report by the NFA which recounted complaints from other WIM customers. These complaints indicated additional misrepresentations by Russo and Malcolmson and similar misrepresentations by other WIM APs not named in this suit. However, the summaries of statements by WIM customers in the NFA report are inadmissible hearsay. The audit itself is hearsay, which the CFTC argued is admissible under three possible exceptions: the "public records" exception, the "business records" exception, and the "residual exception." Under the business records and residual exceptions, the statements recounted in the audit report would still constitute hearsay within hearsay.

The public records exception, Fed.R.Evid. 803(8) does allow factual findings within government reports to be admitted. However, even assuming the NFA is a public agency under Fed.R.Evid. 803(8), the report does not present factual findings. Rather it simply recounts statements by WIM customers. Rule 803(8) only covers information based on the knowledge or observations of the writer. *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir.1994). Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible. *U.S. v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983); *Parsons v. Honeywell, Inc.* 929 F.2d 901, 907 (2d Cir.1991). Therefore, the Court cannot consider the customer statements in the audit report for the truth of their contents and cannot use those statements as additional evidence of pervasive fraud.

**3.** Duane Dipert entered into a settlement agreement with WIM, Wilshire, Russo, Michael Pucci, and NCCI in December 2002. Under this agreement, Mr. Dipert received $7,000.00 and agreed to release the other parties from any claims. Although the Plaintiff's evidence indicates that Mr. Dipert lost $9,908.22, the Court must respect this private agreement and consider Mr. Dipert adequately compensated.

**4.** These figures are taken from Plaintiff's Exhibit 16 and the testimony of Lacey Dingman

amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. § 13a–1(d)(1). As with its restitution argument, the CFTC urges the Court to base the civil penalties based on the Defendants' total earnings from all customers from 2000–2004. However, the statute specifically ties the civil penalty to specific violations. As articulated above, the Court cannot presume violations beyond those on which it heard evidence.

The Plaintiffs presented some evidence regarding the amount of commissions and fees paid by each of the testifying customers. The testifying customers apparently paid approximately $53,291.36 in commissions and fees. However, it is difficult to discern how particular commissions were divided amongst the defendants. In any event, it does not appear that triple the benefit from the testifying customers to any individual defendant exceeded $100,000.

The violations in this case were blatant. As noted above, the Defendants are unapologetic and brazen and display little intention of changing. Therefore, imposing the maximum fine allowed is justified. Malcolmson, Russo, Wilshire, and WIM will be fined $100,000 each.

The CFTC also seeks a separate fine against NCCI based on their contract with WIM. However, as the CFTC itself points out, NCCI is not liable for any of its own conduct; NCCI is only involved because of the contract making it "jointly and severally liable for, all obligations of the introducing broker [WIM] under the Commodities Exchange Act." It is inappropriate to impose a separate fine on NCCI. Rather, NCCI is jointly and severably liable for WIM's fine.

## D. DISGORGEMENT

Finally, the CFTC seeks disgorgement of all the Defendants' ill-gotten gains. Disgorgement is a valid remedy for CEA violations. *See, e.g., CFTC v. British American Options Corp,* 788 F.2d 92, 93–94 (2d Cir.1986). However, the civil penalty imposed above is sufficient to ensure that the Defendants did not profit from defrauding the testifying customers. An additional order for disgorgement is not necessary.

### *ORDER*

In light of the foregoing, it is **ORDERED AND ADJUDGED** that:

1.) Defendants' Motion to Exclude Plaintiff's Claim for Restitution [DE # 44] is **DENIED**;

2.) Plaintiff's Motion to Exclude Certain of Defendants' Trial Exhibits [DE # 45] is **GRANTED**;

3.) Defendants' Requests for Hearing on Motions in Limine [DE # 49 & # 51] are **DENIED AS MOOT**.

4.) The relief of injunction, restitution, and civil penalty requested in the Plaintiff's Complaint is **GRANTED** as outlined above.